IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
        v.                     )  Criminal Action No.
                               )  05-00344-01/2-CR-W-ODS
GARY EYE and                   )
STEVEN SANDSTROM,              )
                               )
            Defendants.        )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANTS' MOTION TO SUPPRESS TELEPHONE CONVERSATIONS**

Before the court is defendant Gary Eye's motion to
suppress telephone conversations which were taped during his
incarceration at the Jackson County Detention Center on the
grounds that the taping was done without defendant's
knowledge and consent, and was done in violation of the
federal wiretap statute, The Electronic Communications
Privacy Act ("the Act"), 18 U.S.C. §§ 2510-2522.  Defendant
Sandstrom joined in Eye's motion.  I find that defendants
were repeatedly warned that their calls could be monitored,
the evidence establishes (and they admitted) they knew the
calls could be monitored, they used the telephones despite
that knowledge, and therefore they impliedly consented to
the recording of their calls.  Therefore, defendants' motion
to suppress should be denied.

## I.   BACKGROUND

On May 17, 2006, a superseding indictment was returned charging both defendants with two counts of interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B); one count of using or discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); two counts of using or discharging a firearm during a crime of violence causing murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and (a)(3)(A); one count of obstruction of justice, in violation of 18 U.S.C. § 1519; and one count of using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1).  In addition, defendant Sandstrom is charged with one count of threatening to retaliate against a federal witness, in violation of 18 U.S.C. § 1513(b)(2).

Defendant Eye filed the instant motion to suppress telephone conversations (document number 33), arguing that the recorded conversations were made without his knowledge or consent.  Defendant Sandstrom requested leave to join in this motion (document number 43), and his request was granted (document number 44).

2

In its response (document number 37), the government argues that all inmates using a phone at the Jackson County Detention Center are informed that the call is subject to monitoring and recording, and that the law enforcement exception applies in this case.

The suppression hearing was held in two parts. After the first suppression hearing, the government uncovered additional information relevant to the issue and asked that the hearing be reopened. "1Tr." refers to the transcript of the first suppression hearing, and "2Tr." refers to the transcript of the second suppression hearing.

During the hearings, defendant Eye was represented by John Osgood; defendant Sandstrom was represented by John Gromowsky; and the United States was represented by Assistant United States Attorneys Michael Green, Michael Hunt, and David Ketchmark.

The following witnesses testified:

1. Major James McCoy, Jackson County Department of Corrections, Manager of Detention Services.

2. Special Agent Heith Janke, Federal Bureau of Investigation.

3. Defendant Gary Eye.

4. Defendant Steven Sandstrom.

5.     Sheila Rafferty, Program Project Manager for
       Sprint.

In addition, the following exhibits were admitted:

P. Ex. 1   Picture of telephone in the inmate living
           area of unit 7A.

P. Ex. 2   White instruction paper that is on the
           telephone in the detention center.

P. Ex. 3   Stipulation that each inmate call is
           recorded, at the beginning of all calls
           placed by inmates there is a recorded voice
           stating "Hello, this is a collect call from
           (inmate's name), this call is subject to
           monitoring and recording.  No third-party
           calls are allowed, thank you for using
           Sprint."  Throughout each call, approximately
           every three minutes the following recording
           is played, "This call is from an inmate at
           the Jackson County Detention Center."
           Inmates entering the detention facility are
           not asked or required to sign an explicit
           consent form acknowledging that calls are
           recorded.

P. Ex. 4   Computer printout of defendant Sandstrom's
           housing history for the Jackson County
           Detention Center.

P. Ex. 5   Computer printout of defendant Eye's housing
           history for the Jackson County Detention
           Center.

P. Ex. 6   Updated computer printout of defendant
           Sandstrom's housing history for the Jackson
           County Detention Center.

P. Ex. 7   Updated computer printout of defendant Eye's
           housing history for the Jackson County
           Detention Center.

```
P. Ex. 8   Printout provided by Sprint in response to
           subpoena, showing calls, dates, and times,
           and which phone in the facility generated the
           call.

P. Ex. 9   CD of phone calls from detention center.

P. Ex. 10  CD of phone calls from detention center.

P. Ex. 11  CD of phone calls from detention center.

P. Ex. 12  Pictures of phones in the intake area of the
           Jackson County Detention Center.

P. Ex. 13  Example of one of the phones in the detention
           facility.

P. Ex. 14  Partial transcript of telephone conversation.

P. Ex. 15  Partial transcript of telephone conversation.

P. Ex. 16  Partial transcript of telephone conversation.

P. Ex. 17  Partial transcript of telephone conversation.

D. Ex. 1   Demonstrative Jackson County Detention Center
           phone log.
```

## II.   FINDINGS OF FACT

On the basis of the evidence presented during the hearings, I make the following findings of fact:

1.   About 75 percent of the inmate population at the Jackson County Detention Center (hereinafter referred to as "detention center") are pretrial detainees (1Tr. at 5). When a new inmate is brought to the detention center, he is searched and then taken to the booking counter where any medical issues are determined and the inmate's picture is

5

taken (2Tr. at 15-16, 22). A bar code is printed with a
wristband, and then the inmate is allowed to go into open
seating where he has access to the phone and a television
(2Tr. at 16, 24). Sack lunches are provided, and the inmate
has access to the restroom (2Tr. at 16). The goal of the
detention center is to get the inmate processed through
intake within 180 minutes (1Tr. at 16, 24). The inmate is
taken to the booking counter and advised of the charges,
then he is taken to the dressing area if he does not make
bond where his personal property is inventoried and he is
given jail issue clothing (2Tr. at 16). The inmate is taken
to the classification unit where he is screened for housing,
and then he is transported to housing (2Tr. at 16).

    2.   The detention center has 52 separate housing
units, and each unit has at least two telephones in the main
area (1Tr. at 6). There are a total of more than 150 phones
for inmates' use (1Tr. at 25). These phones are for the
inmates' personal use to contact family, friends, and
attorneys (1Tr. at 6). There are approximately 750 inmates
in the detention center (1Tr. at 25).

3.    The current phone system in the detention center has the capability of monitoring and recording[1] telephone calls (1Tr. at 6).  Prior to the change in systems in 1996, inmates were abusing the system and using the phones to contact and threaten witnesses and were creating a nuisance to the public (1Tr. at 7).  The new system announces to the person called and to the inmate making the call that the call is from the Department of Corrections, the conversation would be recorded, and the conversation was subject to being monitored and recorded (1Tr. at 7).  The calls are collect and the person called must accept the charges (1Tr. at 7).  In addition, the detention center uses the phone system to confront inmates about complaints due to phone calls (1Tr. at 7-8).

4.    The purpose of the system of recording inmate telephone calls is simply to have the ability to investigate any complaints of harassment by the public involving an inmate (1Tr. at 34).  The recorded conversations are never monitored by detention center personnel or even listened to unless someone reports that harassing phone calls have been

---

[1]The detention center can exclude certain numbers from being recorded upon request (2Tr. at 38). For example, calls to the Public Defender's number are not recorded (2Tr. at 38).

coming from an inmate (1Tr. at 34). Sprint employees occasionally monitor phone calls in order to make sure the system is running properly (2Tr. at 39). If a Sprint employee hears something of concern while monitoring the inmates' calls, the employee will notify authorities (2Tr. at 39).

5. The recordings of calls are also used to respond to subpoenas (1Tr. at 33). The only way to retrieve any recorded calls is by having the number to which the call was placed (1Tr. at 35). If someone requested all calls made by a specific inmate, that could not be done unless someone were to listen to every call made from the pod where the inmate was housed and sort out the calls where the person identified himself on the recording (1Tr. at 35, 39, 40). The detention center will not honor a subpoena with a name, the center requires a phone number to perform a search for recorded calls (1Tr. at 40).

6. The telephones in the detention center have a laminated piece of paper on the front which contains instructions for operating the phone (1Tr. at 9-10; P. Ex. 1; P. Ex. 2). The instructions are in English and in Spanish (1Tr. at 11; P. Ex. 2). These instructions are on

all phones used by inmates in the detention facility (1Tr. at 10).  The instructions read as follows:

> All calls are collect calls.  Press 1 for English.
> Press 2 for Spanish.  Dial area code plus number.
> After the beep, state your name.  Processing call
> may take up to 25 seconds.  Calls are subject to
> monitoring and recording.  No three-way phone
> calls allowed.

(1Tr. at 11; P. Ex. 2).

7.    When an inmate uses a telephone, the instructions for using the phone are heard by the inmate, and there is a warning that calls are subject to monitoring and recording (1Tr. at 11; 2Tr. at 36).  The person receiving the call also gets that message (1Tr. at 11-12; 2Tr. at 36).

8.    The recordings were designed to discourage inmates from abusing the phone system and threatening witnesses (1Tr. at 18).  The system is capable of and records every telephone call, unless the number called has been excluded (see footnote 1) (1Tr. at 18).  The calls are not monitored by jail personnel[2], but every call is recorded by a computer system (1Tr. at 20, 25, 29, 33).  The recorded calls are not listened to by jail employees unless there is an incident

---

[2]The only exception is when a staff person receives a call from an inmate phone (1Tr. at 33).  In that instance, the system prints out a notification that a staff member received a prisoner call so that the staff can investigate (1Tr. at 33).

Case 4:05-cr-00344-ODS   Document 183   Filed 09/05/06   Page 9 of 26

that requires it (1Tr. at 20).  If a request is made, a particular phone number must be provided and that number is searched (1Tr. at 26).  No other calls are pulled up besides calls to that particular phone number (1Tr. at 26). Occasionally due to computer glitches, calls will not be recorded, but the jail staff does not know that until a request is made and the calls are reviewed (1Tr. at 27).

9.   If an inmate needs to make a call to a person or agency who will not accept a collect call, the inmate can get permission from a staff person or case manager to use a staff phone (1Tr. at 12).

10.  The staff person will take the inmate to an office and allow the inmate to make the call once the call is verified (1Tr. at 12).  The staff person must stay in the room during the call because the inmate is in an office and there is other information around about other inmates (1Tr. at 26).

11.  Defendant Eye and Defendant Sandstrom were inmates at the detention center during a portion of 2005 (1Tr. at 8).  The records initially showed that defendant Eye was in the detention facility from March 24, 2005, through October 12, 2005, and that defendant Sandstrom was in the detention facility from April 13, 2005, through October 12, 2005 (1Tr.

10

at 13-14; 2Tr. at 7; P. Ex. 4; P. Ex. 5).  However,
additional records showed that Sandstrom was admitted into
the facility on March 18, 2005 at 1:10 a.m. and booked into
the institution at 1:46 a.m. (2Tr. at 9).  Sandstrom was
taken to intake Housing Unit 3B at 3:25 a.m. (2Tr. at 10).
Defendant Eye was admitted into the facility on March 16,
2005, at 1524 hours, or 3:24 p.m., and was booked at 1624,
or 4:27 p.m. (2Tr. at 11).  Defendant Eye was taken to
Housing Unit 3B (2Tr. at 11).  There are four phones in the
intake area for inmates and two phones in 3B module for
inmates (2Tr. at 12, 24).  Inmates are allowed to use the
phones in intake to try to make bond or get out of custody
(2Tr. at 14).  The phones in intake are free, but the phones
in the general housing areas are collect calls only (2Tr. at
14, 32).  All of the phones have the printed warning about
calls being subject to monitoring and recording; and
although that printed warning also states calls are collect,
inmates in the intake area are told that local calls are
free (2Tr. at 25).  The phones in intake have a ten-minute
time limit, and the other phones have a 30-minute limit
(2Tr. at 32).

     12.  The recordings that were produced by the detention
center in response to a grand jury subpoena were not made at

the request of the government (1Tr. at 30). They were made
in accordance with the above-described procedure for
recording inmate calls.

13. FBI Special Agent Heith Janke served a subpoena on
the Jackson County Detention Center in connection with this
case (1Tr. at 46). The FBI obtained the telephone numbers
listed in the subpoena through its investigation, including
interviewing witnesses, and the request was made for phone
calls to those numbers beginning on March 9, 2005 (1Tr. at
47, 48). The detention center responded by producing
numerous CDs containing telephone calls with the numbers
that had been requested in the subpoena (1Tr. at 46). The
CDs contained approximately 311 telephone calls (1Tr. at
47). At the time of the first suppression hearing, Special
Agent Janke had listened to approximately 50%[3] of the calls
on the CDs (1Tr. at 47, 49; 2Tr. at 70). About 15 of those
calls were made by defendant Eye, and a great majority of
the calls were made by defendant Sandstrom (1Tr. at 47-48).
Fourteen of the 15 calls made by defendant Eye were made on

_____

[3]Special Agent Janke testified that he had not yet
listened to them all because each phone call is about 30
minutes long and it is taking some time to review them all
(1Tr. at 50).

12

March 16, 2005, and the last one was made on September 24, 2005 (1Tr. at 48).

14. Every call that Special Agent Janke had listened to at the time of the first suppression hearing contained the recorded warning outlined in P. Ex. 3, that is, "Hello, this is a collect call from (inmate's name), this call is subject to monitoring and recording. No third-party calls are allowed, thank you for using Sprint." (1Tr. at 49, 53; 2Tr. at 70; P. Ex. 3). However, it was subsequently learned that due to a problem with the recording system, some calls during March and April 2005 were recorded without the voice warning at the beginning telling the inmate and the recipient of the call that the call was subject to monitoring and recording (2Tr. at 36, 38). The phones with that problem were located in intake and in 3-B (2Tr. at 36). The "glitch" was discovered by Sheila Rafferty, Program Project Manager for Sprint, when she was checking all the phones as part of her duties of maintaining the phone and recording system (2Tr. at 37).

15. Additionally, Special Agent Janke continued to listen to the conversations that were produced in response to the subpoena, and he discovered some conversations that did not have the verbal warning at the beginning (2Tr. at

13

71). Special Agent Janke counted the conversations with and without the preamble and discovered that 45 CDs do have the preamble and 12 CDs do not have the preamble on any of the conversations involving the defendants[4] (2Tr. at 74, 90).

16. Of the conversations without the preamble, defendant Gary Eye was involved in 14 calls, and defendant Steven Sandstrom was involved in 30 of the calls (2Tr. at 76). In certain of those calls which did not contain the preamble about the call being subject to monitoring and recording, Special Agent Janke believes the defendants talked as though they believed they were being monitored and recorded (2Tr. at 91). For example, in one conversation defendant Eye is talking to defendant Steven Sandstrom:

> GE[5]: I already went through my 20. It's all bad. It's all good. They didn't charge me with shit. I'm only here for an absconder, but they're asking for someone named -- some dude named Stevie, asking for some dude named Vince and

> SS: What do they want Stevie for?

---

[4]There are 21 CDs that predate the homicide at issue in this case, and Special Agent Janke has not yet listened to those (2Tr. at 74). Those conversations were not requested in the subpoena because they were outside the date restrictions in the subpoena, and the government has no interest in those conversations (2Tr. at 74, 87).

[5]The initials in the cited portions of the transcripts are the initials of the speaker, GE being Gary Eye, SS being Steven Sandstrom, etc.

14

(2Tr. at 96; P. Ex. 16).

17.   Special Agent Janke believes that because Steven
Sandstrom referred to himself in the third person, and
because Eye knew he was talking to "Stevie", the two
defendants were talking in code because they knew they were
being recorded (2Tr. at 96-97; 101-102).

18.   Another example is a conversation between
defendant Gary Eye and Regennia Rios:

> RR:   What you think you're gonna do?  Six months set
> back?
>
> GE:   I don't know.  I hope not.  I'm gonna try to
> [unintelligible], so I can run.
>
> RR:   Hmm.  You're silly, why would you say that on the
> phone (unintelligible).
>
> GE:   Fuck the man.

(2Tr. at 98; P. Ex. 16).

19.   Special Agent Janke believes that Ms. Rios's
reference to saying things on the telephone means that she
knows the call is being recorded, and defendant's comment
"Fuck the man" implies that he knows he is being recorded
but does not care (2Tr. at 98).

20.   Another conversation between defendant Eye and
Regennia Rios went as follows:

15

GE: [G]uess whose picture they showed me?  You know
    that old boy we picked up that one night?  From 2
    Os?  We all went all the way out to that store and
    in the restroom and shit?

RR: Yeah.

GE: Don't say his name.  But yeah.

(P. Ex. 15).

21.  Although this call did not have the preamble
warning of the possibility of monitoring and recording,
defendant instructed Ms. Rios not to use the person's name
and then went on to try to describe the person without using
his name, because Ms. Rios could not figure out who
defendant was talking about.

22.  During a conversation between defendant Sandstrom
and Kristina Chirino that did not have the preamble, the
following was said by Sandstrom:  "It, it could be one of
two things and don't say nothing on this phone because they
are listening to it." (2Tr. at 107; P. Ex. 14).

23.  Defendant Eye dropped out of school in seventh
grade, and obtained his GED in 2003 (1Tr. at 55).  He is
able to read and write (1Tr. at 56).  Defendant was able to
read the sign on the phone in the detention center, and in
fact he did read the sign (1Tr. at 56-58; P. Ex. 1).  He
also heard the recording at the beginning of phone calls

16

stating that the call was subject to being monitored and recorded (1Tr. at 62). Defendant never signed anything saying his phone calls would be recorded (1Tr. at 58). He believed calls being "subject to" recording meant that they "might" be recorded (1Tr. at 58, 61).

24. Defendant Sandstrom dropped out of school in seventh grade, but he can read (1Tr. at 65, 68). Sandstrom read the printed instructions and warning on the phones he used at the detention center (1Tr. at 65-66, 68-69). He also heard the recording before some phone calls warning that the call was subject to being recorded and monitored (1Tr. at 69). His understanding of the policy of recording phone calls was that certain calls would be monitored if officials had a reason (1Tr. at 66). He did not believe his telephone calls were being recorded (1Tr. at 66, 67). Sandstrom did not give anyone permission to record his telephone calls (1Tr. at 66).

### III. PROPRIETY OF TELEPHONE RECORDINGS

Defendants argue that the detention center's recording their telephone calls violates the Electronic Communications Privacy Act on the ground that the warning on the telephones (both written and oral) states that the calls were "subject

17

to" recording and not that all of the calls "would be" recorded.[6]

The Electronic Communications Privacy Act ("the Act"), 18 U.S.C. §§ 2510-2522, generally prohibits the recording of wire communications without a warrant and prohibits admission of those recordings into evidence unless a specific exception to the Act applies. The Act clearly applies to prison monitoring. United States v. Horr, 963 F.2d 1124 (8th Cir.), cert. denied, 506 U.S. 848 (1992); United States v. Amen, 831 F.2d 373, 378 (2nd Cir. 1987), cert. denied, 485 U.S. 1021 (1988).

One exception to the Act provides that it is not unlawful for law enforcement officials to intercept a wire, oral, or electronic communication where one of the parties to the communication has given prior consent to the interception. 18 U.S.C. § 2511(2)(c). The legislative history shows that Congress intended the consent requirement to be construed broadly. The Senate Report specifically says in relation to § 2511(2)(c): "Consent may be expressed

---

[6]Defendants' attorneys argued this point during the hearing; and in the motion to suppress, defendants state that "consent cannot be inferred simply because someone at the Detention Center might have told defendant that they might monitor the phone, but not that they were in fact doing so." (p. 3).

18

or implied.  Surveillance devices in banks or apartment houses for institutional or personal protection would be impliedly consented to."  S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin.  News 2112, 2182.

"It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording."  United States v. Faulkner, 439 F.3d 1221, 1224 (10th Cir. 2006).  When an inmate has repeatedly received notice that calls placed on prison telephones are subject to surveillance, the evidence indicates that he is in fact aware of the monitoring program, and he nevertheless uses the telephones, by that use he impliedly consents to be monitored for purposes of the Act.  United States v. Workman,  80 F.3d 688 (2nd Cir. 1996).

In United States v. Workman, one of the defendants, Donald Green, challenged the admission of conversations recorded from a prison phone.  In that case, a sign, written in English and Spanish, notifying inmates of the monitoring program was placed near each telephone in the prison.  The warning read:

19

```
                    NOTICE
ALL INMATE TELEPHONE CONVERSATIONS ARE SUBJECT TO
ELECTRONIC MONITORING BY DEPARTMENTAL PERSONNEL.
```

One week after arriving at the institution, Green was given a handbook which included a discussion of the telephone policy.  In affirming the district court's denial of Green's motion to suppress, the court of appeals stated, "Furthermore, Green's statements on the recordings show that he was successfully informed by the prison's notification program.  On many of the tapes, Green warned his interlocutors that the call might be monitored, and he sometimes used coded language in an apparent effort to mislead authorities who might be listening."  The court went on as follows:

> Green argues that the notice he received was
> insufficient. In particular, he claims that--unlike the
> federal prison inmates in <u>Willoughby</u> and <u>Amen</u>--he was
> told of New York's prison telephone monitoring program,
> but never expressly informed either that his use of the
> telephones would constitute consent to the
> surveillance, or that the monitoring could include
> recording of his conversations.
>
> Green's argument misunderstands the reasoning of <u>Amen</u>
> and <u>Willoughby</u>. Nothing in those cases turned on
> whether the prisoner was specifically told that use of
> the telephones constituted consent. Rather, we inferred
> consent from circumstances indicating that the prisoner
> used the telephone with awareness of the possible
> surveillance. <u>See</u> <u>Amen</u>, 831 F.2d at 378. "The
> legislative history [of Title III] shows that Congress
> intended the consent requirement to be construed

20

broadly." Id.; see S.Rep. No. 1097, 90th Cong., 2d
Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2182. **When
an inmate has repeatedly received notice that calls
placed on prison telephones are subject to
surveillance, the evidence indicates that he is in fact
aware of the monitoring program, and he nevertheless
uses the telephones, by that use he impliedly consents
to be monitored for purposes of Title III.** See 831 F.2d
at 379 (where "defendants had notice of the inter-
ception system . . . their use of the telephones . . .
constituted implied consent to the monitoring").

Green points out that neither the sign near the
telephone nor the inmate handbook provided to him
expressly stated that the monitoring program might
include recording. That is of no importance. Recording
is simply one way of preserving the information gained
from the electronic monitoring. The prison need no more
have provided notice that it would record the
intercepted conversations than that it might maintain
shorthand notes.

United States v. Workman, 80 F.3d at 693-94 (emphasis

added). That court, as mentioned above, made no distinction

between a warning that calls were "subject to" monitoring

and a warning that all calls "would be" monitored.

Other courts have overwhelmingly denied the suppression

of conversations recorded on prison phones when the evidence

establishes that the prisoner was aware that the call could

be monitored. In United States v. Hammond, 286 F.3d 189,

192 (4th Cir.), cert. denied, 537 U.S. 900 (2002), the court

stated, "We conclude that the 'consent' exception applies to

prison inmates, such as Hammond, required to permit

monitoring as a condition of using prison telephones."

21

In <u>United States v. Willoughby</u>, 860 F.2d 15, 19-20 (2d Cir. 1988), <u>cert</u>. <u>denied</u>, 488 U.S. 1033 (1989), the court held that notification at an orientation lecture and signs near the telephones stating, "The Bureau of Prisons reserves the authority to monitor conversations on this telephone. Your use of institutional telephones constitutes consent to this monitoring" was sufficient to justify the inference of consent by prisoners who used the phones. In that case, the inmate also expressly agreed to be monitored by signing a consent form; however, the court made clear that use of the telephones in any event constituted implied consent, given the orientation lecture and the notification sign near the telephone. The form signed by the inmates, just like the warning posted by the telephones, stated that the prison reserved the right to monitor phone calls. It did not state that the prison would record all phone calls.

In <u>United States v. Moore</u>, 452 F.3d 382 (5th Cir. 2006), the court of appeals held that the defendant had impliedly consented to his calls from a prison phone being recorded. The following warning was posted at all prison phones:

> Notice: The Bureau of Prisons to Inmates. Telephone Regulations. All conversations on this phone are subject to monitoring. Your use of this telephone

> constitutes consent to this monitoring. You must
> contact the unit team to request an unmonitored
> attorney call.

Id. at 387 n.3.

In that case, although the warning was that the
conversations were "subject to monitoring", the court found
that the Bureau of Prisons "sufficiently notified Moore that
his phone calls were subject to surveillance and recording"
and therefore denied his motion to suppress.  The court made
no distinction between the "subject to" wording and the fact
that all calls were recorded; nor did the court make a
distinction between the warning that calls were subject to
being monitored when in fact the calls were recorded.

See also United States v. Footman, 215 F.3d 145, 154
(1st Cir. 2000); United States v. Van Poyck, 77 F.3d 285,
292 (9th Cir. 1996) United States v. Horr, 963 F.2d 1124,
1126 (8th Cir. 1992); United States v. Amen, 831 F.2d 373,
378 (2nd Cir. 1987), cert. denied, 485 U.S. 1021 (1988).

In this case, the undisputed evidence establishes that
(1) every phone in the detention center had a warning
attached to it stating that calls made from that phone were
subject to monitoring and recording; (2) almost every call
which the government plans to use in evidence was preceded
by a voice recording warning the defendants and the person

23

they called that the call was subject to monitoring and recording; (3) both defendants testified that they read the warnings attached to the phones and knew that the calls were subject to monitoring and recording; (4) defendant Eye, in a conversation without the recorded warning, was talking to Regennia Rios and told her not to say the name of a person they were talking about, clearly establishing that he knew his call was being monitored or recorded; (5) rather than saying the person's name on a call that did not have the recorded warning, defendant Eye spent considerable time describing the person to Ms. Rios who, at first, did not know the person Eye was talking about, again establishing that he knew he was being monitored or recorded; and (6) when defendant Sandstrom was on a call without the recorded warning, he instructed Kristina Chirino not to say anything on the phone because "they" were listening to it, clearly establishing he knew the call would be monitored or recorded.

Because defendants were repeatedly warned that the calls were subject to monitoring, through verbal warnings at the beginning of almost every phone call and through the written warnings attached to every prison phone; and because the evidence clearly shows that both defendants knew their

24

calls were subject to being monitored; and because despite
that knowledge, they chose to use the prison phones, I find
that both defendants impliedly consented to the monitoring
and recording of their calls, and therefore the recording of
these calls did not violate the Electronic Communications
Privacy Act.

Defendants' argument that they believed "subject to"
meant their calls "might be" monitored is without merit.
Defendants have offered no case wherein a prisoner was told
his calls were subject to being monitored but where a court
held that was not sufficient to find implied consent, and I
have been able to find none.  Defense counsel argued at the
suppression hearing that people speeding, taking the chance
that they will be caught by an officer, but knowing they may
not be caught, is what defendants did in this case -- took
the chance that their calls would not be monitored since
they were only "subject to" being monitored.  Aside from the
fact that defendants' argument is wholly unsupported by the
law, I also note that speeding is against the law, whether
one is caught or not.  If one is caught speeding, he can
hardly argue he should not be punished because he took the
chance he would not be caught.  Such is defendant's argument
here, and it is not the least bit persuasive.

Because defendants knew their calls could be monitored and used the prison phones despite that knowledge, defendants impliedly consented to the monitoring and recording of their calls.  Therefore, defendants' motion based on their unsupported argument that the "subject to" language nullifies implied consent should be denied.

## IV.  CONCLUSION

On the basis of the above-stated findings of fact and the law as discussed in section III, I find that defendants impliedly consented to the recording of their telephone conversations and therefore the recording did not violate the Electronic Communications Privacy Act.  Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendants' motion to suppress recorded telephone conversations.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 5, 2006

26