IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 05-00344-02-CR-W-ODS |
| STEVEN SANDSTROM, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

Before the court is defendant's motion to suppress statements he made on March 18, 2005, and on April 11, 2005, on the grounds that he did not have counsel, he was in a coercive atmosphere, he was intoxicated on narcotics, and police promised him he would not be charged with homicide if he cooperated. I find that defendant was advised of his Miranda rights, he voluntarily waived those rights, and he voluntarily provided a statement to police on both March 18, 2005, and on April 11, 2005. I further find that there is no credible evidence that (1) defendant was in a coercive environment, (2) that he was incapable of voluntarily waiving his Miranda rights and providing a statement due to methamphetamine use, or (3) that the police promised defendant if he provided a statement he would not be charged with homicide. Therefore, defendant's motion to suppress should be denied.

## I. BACKGROUND

Defendant is charged by way of a superseding indictment with two counts of interference with federally protected activities, in violation of 18 U.S.C. § 245(b)(2)(B); one count of using or discharging a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); two counts of using or discharging a firearm during a crime of violence causing murder, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and (j)(1); one count of tampering with a witness, in violation of 18 U.S.C. §§ 1512(a)(1)(C) and (a)(3)(A); one count of obstruction of justice, in violation of 18 U.S.C. § 1519; one count of using fire to commit a felony, in violation of 18 U.S.C. § 844(h)(1); and one count of threatening to retaliate against a federal witness, in violation of 18 U.S.C. § 1513(b)(2). On March 14, 2006, defendant Sandstrom filed the instant motion to suppress (document number 58). On April 14, 2006, the government filed a response in opposition to the motion, arguing that defendant signed a Miranda waiver form, did not appear to be under the influence of narcotics, and was not made any promises that he would not be charged with homicide (document number 90).

A hearing was held on April 24, 2006. Defendant was present, represented by John Gromowsky. The government

was represented by Assistant United States Attorneys Michael Green and David Ketchmark.

The following witnesses testified at the hearing:

1. Detective Matthew Williams, Kansas City, Missouri, Police Department.

2. Detective Robert Blehm, Kansas City, Missouri, Police Department.

3. FBI Special Agent Arch Gothard.

4. Defendant Steven Sandstrom.

In addition, the following exhibits were admitted:

P. Ex. 1  *Miranda* waiver form.

P. Ex. 2  Detective Investigation Report.

P. Ex. 3  New Admit Appraisal Form from Jackson County Detention Center.

P. Ex. 4  Report of interview with defendant.

P. Ex. 5  *Miranda* waiver form.

P. Ex. 6  Report reflecting defendant's admission to the city jail on April 11, 2005, at 11:32 a.m.

P. Ex. 7  New Admit Appraisal Form from Jackson County Detention Center.

P. Ex. 8  Interview Investigative Report.

## *II. FINDINGS OF FACT*

On the basis of the evidence presented during the hearing, I make the following findings of fact:

1. On March 18, 2005, at 1:10 a.m., defendant was admitted to the Jackson County Detention Center on warrants unrelated to the murder case at issue here (Tr. at 44-45; P. Ex. 3). When defendant was admitted, he was asked whether he had used any drugs in the past 24 hours, and he answered, "crystal meth" (Tr. at 57).

2. Later in the evening of March 18, 2005, defendant was interviewed by Detective Matthew Williams and Detective Robert Blehm in relation to the murder of William McCay (Tr. at 6-7, 36; P. Ex. 2). Defendant had been in the Jackson County Detention Center, but he was being released (Tr. at 31, 44). Detective Williams and Detective Blehm were at the detention center on defendant's release and asked him if he would agree to be questioned (Tr. at 31-32, 45). Defendant was driven to the police station, and he was not handcuffed or shackled (Tr. at 31, 59). He was not in custody, and the police had no reason to hold him (Tr. at 32).

3. Prior to the interview, Detective Williams completed a Detective Investigation Report which included such matters as name, date of birth, family members, addresses, employment, scars, identifiable features such as tattoos and missing teeth (Tr. at 6). On the form, defendant was listed as a suspect, and he was listed as being on probation/parole (Tr. at 8; P. Ex. 2). Defendant knew he was a suspect in the William McCay murder (Tr. at

4

20-21). Defendant was also noted as being cooperative (Tr. at 8-9; P. Ex. 2).

    4. During the preliminary questioning, Detective Williams asked defendant if he was under the influence of drugs or alcohol, and defendant said he was not (Tr. at 9, 38; P. Ex. 2). The officers did not have access to the admit form from Jackson County indicating that defendant had admitted to using drugs within 24 hours of his admission, an answer he had given at 1:10 a.m., or some 17 hours earlier (Tr. at 58). It was Detective Williams' opinion, based on his experience dealing with individuals under the influence of alcohol or drugs, that defendant Sandstrom was not under the influence of either during this questioning (Tr. at 10). Defendant did not have slurred speech (Tr. at 10). His answers were appropriate to the questions asked (Tr. at 10). There was no odor of alcohol about defendant Sandstrom (Tr. at 10). Based on these observations and defendant's denial of drug or alcohol use, Detective Williams noted on the interview form that defendant was not under the influence of alcohol or drugs (Tr. at 9-10; P. Ex. 2). At no time during the interview did defendant do anything to suggest to Detective Williams that he was under the influence of drugs or alcohol (Tr. at 18).

    5. Prior to questioning defendant, he was presented with a <u>Miranda</u> waiver form prepared by Detective Blehm (Tr.

5

at 39). Detective Blehm had defendant read the form out loud, then he asked defendant to sign the form if he understood his rights and was willing to speak with the detectives (Tr. at 40, 41). Detective Williams was also present as defendant signed the form (Tr. at 12-13, 41). No promises were made to defendant that he would not be charged with homicide if he cooperated (Tr. at 13, 70).

6. Defendant's questioning began at 6:20 p.m. and ended at 11:59 p.m. (Tr. at 14, 23, 32-33, 44, 61). Defendant was given one soda during his interview (Tr. at 15, 24). He never asked for food or any other drinks (Tr. at 24, 27). Detective Williams stated that he knew defendant had been involved in the homicide that occurred at 9th and Brighton, and defendant stated that he had not been there (Tr. at 28). Detective Williams mentioned that one of the vehicles involved in the homicide was stolen and had been found, and defendant spent quite a bit of time rambling about his history of being a car thief (Tr. at 22-23, 43). Detective Williams and Detective Blehm confronted defendant and said it was hard for them to believe that defendant was not present when the murder took place, and they believed he was withholding information and that he was involved in the homicide (Tr. at 16, 25). Defendant stated that he owes co-defendant Gary Eye "from way back" and he would not rat him out (Tr. at 16-17). Defendant stated that he was surprised

6

at the amount of information he had already provided (Tr. at
17, 26).  Detective Williams asked defendant if he knew
where the murder weapon was, and defendant said he believed
the gun was probably in the river (Tr. at 17).  Detective
Williams asked defendant how he knew that, but defendant
would not answer (Tr. at 17).

    7.   At no time during the interview did defendant give
any indication he was under the influence of drugs or
alcohol -- he did not slur his speech, he did not speak
incoherently, his answers were never non-responsive (Tr. at
18, 41).  At no time did defendant indicate he wanted to
stop the questioning (Tr. at 18).  At no time did defendant
request an attorney (Tr. at 18).  At no time during the
interview was defendant made any promises about whether or
not he would be prosecuted if he cooperated (Tr. at 19, 24,
41-42, 63).  At no time during the interview did Detective
Williams raise his voice (Tr. at 25, 69, 70).

    8.   After the interview concluded, defendant was
returned to the general area of his parents' house because
he did not want to be taken directly to his parents' house
in a police vehicle (Tr. at 15, 17, 23, 33, 43-44).

    9.   On April 11, 2005, defendant was arrested at 8:50
a.m. and was admitted to the city jail at 11:32 a.m. (Tr. at
55, 64, 83).  An officer went over booking questions with
defendant (Tr. at 75).  One of the questions is whether the

person has used "crack/meth" (Tr. at 75). The admit form indicates that defendant reported having used "crack/meth" in the previous 24 hours, and that box was checked (Tr. at 58, 76, 81). The box indicating intoxication was not checked (Tr. at 76). An empty box means the response was negative (Tr. at 76).

    10. Later that day, defendant was interviewed by Detective Blehm and FBI Special Agent Arch Gothard (Tr. at 72). Prior to the interview on April 11, 2005, a Detective Interview Report was not completed, because all of that information had been gathered by Detective Williams on March 18, 2005 (Tr. at 10-11). The officers did not have access to the admit form from the city jail indicating that defendant reported using drugs within 24 hours of his admission (Tr. at 58). Special Agent Gothard, however, knew that defendant was a regular meth user (Tr. at 82, 84).

    11. At 4:32 p.m. Detective Blehm presented defendant with a <u>Miranda</u> waiver form, asked him to read it aloud and to sign it if he understood his rights and was willing to talk to the police (Tr. at 47, 48, 65, 72). Defendant read the form aloud and then signed the form (Tr. at 47, 73).

    12. Defendant never appeared to be intoxicated or under the influence of alcohol or drugs during questioning (Tr. at 50-51, 68, 74). Defendant did not slur his speech, his answers were appropriate to the questions, he did not

8

have any odor of intoxicants about his person, and there was nothing else about his physical demeanor or the way he conducted himself that led the officers to believe defendant was under the influence of drugs or alcohol (Tr. at 74).

    13. Detective Blehm and Special Agent Gothard told defendant that they were not in a position to make any promises to defendant about prosecution (Tr. at 51-52, 60, 70, 77). Neither Detective Blehm nor Special Agent Gothard made any promises to defendant in exchange for his cooperation (Tr. at 77, 85).

    14. Detective Blehm confronted defendant about inconsistencies in what defendant had told police on March 18 (Tr. at 52, 79). Defendant provided information which conflicted with the information he had provided on March 18 (Tr. at 53).

    15. Questioning ended at 7:10 p.m. (Tr. at 48). During questioning, defendant was provided with a Sprite and peanut M&Ms (Tr. at 49, 79). At no time during questioning did defendant indicate he wanted to stop being questioned, he did not request an attorney, and he did not ask for any food or drink other than the Sprite and M&Ms (Tr. at 49-50, 80). At no time during the interview did anyone raise his voice (Tr. at 69, 70, 78).

    16. Once the interview was over, defendant was returned to the detention unit (Tr. at 53).

9

Case 4:05-cr-00344-ODS   Document 187   Filed 09/08/06   Page 9 of 20

17. Defendant testified at the suppression hearing as follows:

a. Defendant has a seventh grade education (Tr. at 88). He has been a drug user for quite some time (Tr. at 89). Defendant used methamphetamine every day, usually three to three and a half grams (Tr. at 89). On one occasion, defendant had been up for two straight weeks on methamphetamine (Tr. at 89). Defendant's typical pattern was to be up on meth for four days, then he would sleep for a day, then be up again for four more days (Tr. at 89).

b. On March 18, 2005, defendant was arrested sometime between 10:30 p.m. and midnight (Tr. at 90). Prior to his arrest, he had used about four grams of methamphetamine over the course of that day (Tr. at 90). He had been up for two to three days at the time of his arrest (Tr. at 90).

c. On April 11, 2005, defendant was arrested at 8:50 a.m. (Tr. at 90). He had used two to three grams of methamphetamine that day (Tr. at 90).

d. When defendant is using methamphetamine, he is sometimes calm and other times he will be up for a week or two straight (Tr. at 91). Most of the time he does not think straight when he is using methamphetamine (Tr. at 91).

e. Defendant was not asked by the detectives on either March 18 or April 11 whether he had been using drugs (Tr. at 91). He told them he had been up for several days using dope, but he believed they did not seem concerned (Tr. at 91).

f. When defendant was picked up for questioning by Detective Blehm on March 18, he was put in handcuffs and leg irons (Tr. at 92).

g. Defendant does not remember a lot about March 18 (Tr. at 92-93). He does not remember any promises being made on March 18 (Tr. at 93). However, on April 11 Detective Blehm told defendant if he told Blehm what he wanted to hear, defendant would not be charged for the murder (Tr. at 93-94, 99). This promise was made after defendant signed the Miranda waiver form (Tr. at 94, 96). Defendant knew what he was doing when he signed the form and was willing to talk to the police (Tr. at 94, 98). Special Agent Gothard was in the room when Detective Blehm made this promise (Tr. at 99).

18. I do not find defendant's testimony credible for the following reasons:

a. Defendant first testified that he remembered signing the Miranda waiver form on April 11, and he knew what he was doing. However, his other testimony about that day is inconsistent with having a memory of

11

signing the form and "knowing what he was doing". Defendant testified that he was "spun out" and his mind was going a hundred miles an hour.  He said he was not paying attention but was just acting like he was listening (Tr. at 101).  He also testified that he was so high he did not really understand his Miranda rights, although he previously testified that he knew what he was doing when he signed the Miranda waiver form, and he has a lengthy criminal history and is well familiar with Miranda rights (Tr. at 102).

    b.   Defendant first testified that he figured the officers should have been able to tell that defendant was high because they are law enforcement officers and should know such things (Tr. at 103).  Later, he said he specifically told the detectives he was high.

    c.   Defendant testified that Detective Blehm asked what was wrong because defendant looked a little tired, and defendant said he had been up for six days on meth (Tr. at 103).  He then changed his testimony to saying that he had been up for "a while" (Tr. at 103).

    d.   Defendant agreed that he did not use any drugs or alcohol between the time of his arrest at 8:50 a.m., until his interview at 4:30 p.m. on April 11 (Tr. at 104).  Defendant explained that he uses enough methamphetamine in one day to stay up for two or three

12

days (Tr. at 104). However, defendant had previously testified that he uses methamphetamine every day, not that his methamphetamine use will provide him with a two- to three-day high.

    e. Defendant testified that he remembers answering "yes" when asked whether he had used drugs in the last 24 hours in March, but he does not remember answering "no" in April[1] when the form indicates he said he had not used drugs in the last 24 hours (Tr. at 107). Defendant claiming to remember more about the occasion when he told the admitting personnel he was using drugs than the occasion when he told them he was not using drugs is not plausible.

    f. Defendant testified that he does remember telling the officers he had used drugs when he was first admitted, but he does not remember being presented with the Miranda form 17 hours later because he was strung out on meth (Tr. at 109-110). Defendant's worsening memory 17 hours after his admission when he says his memory was fine is not plausible.

    g. Defendant testified that he was nodding off during his interview in March (Tr. at 111); however,

---

[1]Defendant answered "no" when asked on April 12, the day after his second statement (P. Ex. 7).

13

that is inconsistent with defendant's "rambling on for
quite some time" during that interview about what a
good car thief he is.

### *III. VOLUNTARINESS OF DEFENDANT'S STATEMENTS*

Defendant challenges the voluntariness of his statements on the grounds that he was in a coercive atmosphere, he was intoxicated on narcotics, and he was promised that he would not be charged with homicide if he cooperated.

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his Miranda rights. Colorado v. Connelly, 479 U.S. 157, 158 (1986); United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987). There is no requirement that, to be voluntary, the waiver be the product of a free will. Connelly, 479 U.S. at 170. The sole concern of the Fifth Amendment, upon which Miranda was based, is governmental coercion. Id.; United States v. Washington, 431 U.S. 181, 187 (1977). The voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Connelly, 479 U.S. at 170; Moran v.

14

Burbine, 475 U.S. 412, 420 (1986); Fare v. C., 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his Miranda rights. North Carolina v. Butler, 441 U.S. 369 (1979). An express written or oral statement of waiver of Miranda rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. Id. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That doesn't mean that the defendant's silence, coupled with an understanding of his rights and course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Id. at 373.

Whether a defendant waived his Miranda rights is a question of fact for the trial judge and must be determined on the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. Id. at 374; United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987); Stumes v. Solem, 752 F.2d 317, 319 (8th Cir. 1985). The totality of the circumstances test applies. Dougherty, 810 F.2d at 773.

15

In this case, defendant was advised of his <u>Miranda</u> rights prior to each interview. He read those rights aloud and signed the form indicating he understood his rights and agreed to talk to the police. Defendant even testified at the hearing that he signed the form, he knew what he was doing, and he wanted to talk to the police:

> I signed the <u>Miranda</u> rights. I was willing to talk to them. I mean I ain't got a problem talking to anybody.

(Tr. at 94).

> Q. And that you, in fact, were willing and able to speak with them and when you signed this form you knew what you were doing?
>
> A. Yeah. I knew what I was doing.

(Tr. at 98).

The questioning of defendant lasted five hours and 39 minutes in March, and two hours and 38 minutes in April. This is not particularly lengthy for an interrogation. <u>See Jenner v. Smith</u>, 982 F.2d 328, 334 (8th Cir. 1993) (questioning a suspect for six or seven hours is not unconstitutionally coercive per se). Although defendant argues that his statement was involuntary in part because he was in a coercive environment, defendant offered no evidence at all on this factor. The evidence establishes that defendant was not in custody during the March interview, he was not handcuffed, he was provided with all the refreshments he requested, no one raised his voice during

16

the questioning, and defendant was taken back to his home when the interview concluded. The evidence establishes that defendant was questioned while he was in custody on another matter in April; however, no one raised his voice during the questioning, and defendant was provided with all of the refreshments he requested. There is no plausible evidence that the atmosphere was coercive.

Custodial statements are not per se involuntary because of intoxication. United States v. Brown, 535 F.2d 424, 427 (8th Cir. 1976); United States v. Harden, 480 F.2d 649, 651 (8th Cir. 1973). The standard is whether, by reason of intoxication or other factor, the defendant's "will was overborne" or whether his statements were the "product of a rational intellect and a free will." Townsend v. Sain, 372 U.S. 293, 307 (1963).

A suspect's use of methamphetamine shortly before being arrested does not nullify that suspect's ability to voluntarily consent. In United States v. Contreras, 372 F.3d 974 (8th Cir. 2004), cert. denied, 126 S. Ct. 246 (2005), the defendant had used methamphetamine the day before he gave consent and had used marijuana the day of his consent. In that case, the detectives testified that the defendant appeared to be sober and in control of his faculties at the time he consented. The court therefore

17

found that the consent was voluntary despite the recent drug use.

Such is the case here. During the March interview, defendant was arrested sometime around midnight and was admitted to the Jackson County Detention Center at 1:10 a.m. He was questioned by the detectives beginning at 6:20 p.m. -- more than 18 hours after his arrest. When the questioning with the detectives began, defendant was specifically asked whether he had used drugs during the previous 24 hours, and he said he had not. Defendant was able to read the <u>Miranda</u> rights form aloud without difficulty. Neither Detective Williams nor Detective Blehm observed any signs that defendant was impaired through drug or alcohol use. Defendant talked at length about his skills as a car thief, his answers were responsive and appropriate to the questions asked, he did not appear confused or disoriented. During his statement, defendant gave addresses, he talked about the history of his business stealing cars and taking them to a chop shop until it closed down, and he provided details on how to steal certain cars. There simply is no credible evidence that defendant was impaired during his March interview due to methamphetamine use.

In April, defendant was arrested at 8:50 a.m., and the detectives began their interview at 4:32 p.m. -- seven hours and 42 minutes later, time during which defendant could not

18

have been using drugs.  Defendant was able to read the
<u>Miranda</u> form aloud, and he exhibited no signs of being under
the influence of drugs or alcohol.  Defendant was able to
provide addresses, he provided specific detail about the
times and places where certain events happened.  Defendant
also had the wherewithal to refuse to make a formal
videotaped statement after his interview with police.
Again, there is no plausible evidence that defendant was
impaired by methamphetamine to the extent he was unable to
voluntarily waive his <u>Miranda</u> rights and provide a voluntary
statement to police.

Finally, defendant argues in his motion that he
provided a statement after he was promised by the police
that he would not be charged with murder.  However,
defendant admitted that there was no such promise during his
March statement.  The only evidence of such a promise during
defendant's April statement is his own testimony which I
have found not credible.

Based on all of the above, I find that defendant was
advised of his <u>Miranda</u> rights, he voluntarily waived those
rights, and he voluntarily provided a statement to police on
both March 18, 2005, and on April 11, 2005.  Therefore,
defendant's motion to suppress his statements should be
denied.

## IV. CONCLUSION

Based on all of the above, I conclude that defendant was advised of his *Miranda* rights, he voluntarily waived those rights, and he voluntarily provided a statement to police on both March 18, 2005, and on April 11, 2005. I further find that there is no credible evidence that (1) defendant was in a coercive environment, (2) that he was incapable of voluntarily waiving his *Miranda* rights and providing a statement due to methamphetamine use, or (3) that the police promised defendant if he provided a statement he would not be charged with homicide.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 8, 2006